1
2
3
4
5                    UNITED STATES DISTRICT COURT
6                   NORTHERN DISTRICT OF CALIFORNIA
7
                                        )
8    KAREN ROBERTS, as Trustee of the   )   No. C-03-2397 SC
     Trust of Lloydine Ann Reese, and   )
9    TERRA SAKS-YOUNG, on behalf of     )
     themselves, all others similarly   )   ORDER RE:
10   situated, and the general public,  )   DEFENDANT'S MOTION
                                        )   TO DISMISS FOR
11                                      )   FAILURE TO STATE A
               Plaintiffs,              )   CLAIM UPON WHICH
12                                      )   RELIEF CAN BE
          v.                            )   <u>GRANTED</u>
13                                      )
     NORTH AMERICAN VAN LINES, INC., a  )
14   Delaware corporation,              )
                                        )
15             Defendant.               )
                                        )
16   ─────────────────────────────────

17   **I.   <u>INTRODUCTION</u>**

18        Now before the Court is North American Van Lines' ("North

19   American" or "Defendant") motion to dismiss Plaintiffs' state

20   law causes of action on the grounds that they are preempted by

21   federal law.  Having reviewed the relevant case law and the

22   submissions of the parties, and for the reasons articulated

23   below, the Court grants North American's motion.

24

25   **II.  <u>BACKGROUND</u>**

26        This is a class action arising from North American's

27   allegedly widespread and deceptive practice of baiting

28   consumers of moving services with reasonable, written

**United States District Court**
For the Northern District of California

1   estimates, then increasing the charges to artificially-inflated

2   amounts and holding consumers' household belongings hostage

3   until the artificially-inflated amount is paid.  Pls.' First

4   Amended Complaint ("FAC") at ¶ 1.  The following allegations

5   are taken as true for purposes of this motion.  During the

6   summer of 2002, Mrs. Reese[1] sought to move her daughter's

7   belongings from California to Florida.  She contacted multiple

8   moving companies to provide her with estimates.  On or about

9   July 29, 2002, a representative from North American inspected

10  Mrs. Reese's belongings and provided her with a written, non-

11  binding estimate for the shipment based on an estimated weight

12  of 3,000 pounds.  Pls. FAC at ¶ 23.  On or about August 26,

13  2002, Mrs. Reese received a written estimate from Defendant in

14  which Defendant represented that it would move her daughter's

15  belonging for $3,028.50 based on North American's estimate that

16  the goods weighed 3,500 pounds.  Satisfied with the estimate,

17  Mrs. Reese hired North American to complete the move.  Pls.'

18  FAC at ¶ 4, 23.  Defendant then loaded these belongings onto a

19  moving truck and took them to a weigh station.  Defendant did

20  not provide Mrs. Reese with notice of the time or place of the

21  weighing.  Pls.' FAC at ¶ 26.  After weighing the belongings,

22  Defendant informed Mrs. Reese that her goods weighed 8,180

23  pounds and that the final charge for her move would be

24

25      [1] This lawsuit was originally initiated by Lloydine Ann
    Reese.  At the time the original complaint was filed, Mrs. Reese
26  was a 74-year old widow residing in California.  Mrs. Reese has
    since passed away and her daughter, Karen Roberts, has agreed to
27  serve as a class representative in this case.  Pls.' FAC at ¶
    11.

28                                    2

$6,172.53.  Pls.' FAC at ¶ 27.  Mrs. Reese stated that she would not pay this charge because it was substantially greater than her written estimate.  Defendant then told Mrs. Reese that it would not deliver her goods until it received the full $6,172.53 and threatened to place the goods in storage and charge Mrs. Reese an unloading fee and daily storage fee.  Pls.' FAC at ¶ 29.  Not wanting to incur storage costs, Mrs. Reese paid the full amount.

Mrs. Saks-Young had a similar but more traumatic experience.  In late July of 1999, following her husband's death, Mrs. Saks-Young sought to move from California to Massachusetts.  She contacted several moving companies for estimates, including Defendant.  On or around July 27, 1999, Defendant provided a written estimate for Mrs. Saks-Young's move at $3,444.16 based on an estimated weight of 5,000 pounds.  Satisfied with the estimate, Mrs. Reese hired North American to complete the move.  Pls.' FAC at ¶ 32.  On or around August 3, 1999, Defendant sent two agents to Mrs. Saks-Young's home to move her belongings.  Before loading anything one of the agents informed Mrs. Saks-Young that her move would cost three times the written estimate because her belongings weighed more than twice the estimated weight.  Pls.' FAC at ¶ 33.  Mrs. Saks-Young protested that she would not pay any more than the estimated charge plus 10 percent.  When the agent refused, she instructed them not to move her belongings and indicated that she would hire a different moving company.  Mrs. Saks-Young then left her home due to unrelated business and when she

3

returned, the entire contents of her home and Defendant's moving truck were gone.  Pls.' FAC at ¶ 34.  After several attempts to locate her belongings, Mrs. Saks-Young was informed on or about August 6, 1999 that her belongings had been moved to Massachusetts.  She was further informed that the actual weight of her belongings was 8,000 pounds and that the final cost for her move would be based on this weight.  Pls.' FAC at ¶ 35.  Mrs. Saks-Young stated that she would only pay 110 percent of the estimated charge, and demanded the opportunity to see her belongings reweighed.  Id.  On or around August 13, 1999, Defendant informed Mrs. Saks-Young that her belongings had been reweighed (outside her presence) and their actual weight was 9,200 pounds and the total cost for her move would be approximately $9,100.  Shortly thereafter Mrs. Saks-Young was informed that her belongings would be released only if she paid the $9,100.00 plus the cost of the reweighing, unloading and storage fees.  Pls.' FAC at ¶ 38.  Mrs. Saks-Young refused to pay this amount and in September of 1999 wrote a letter to the office of Defendant's President explaining her problems. In January and February of 2000 Defendant responded with letters stating that if she did not pay the requested fees her goods would be auctioned off.  Since that time, Mrs. Saks-Young has repeatedly attempted to obtain her belongings for 110 percent of the estimated charge, and Defendant has repeatedly refused.  Most recently, Defendant informed Mrs. Saks-Young that her total charges, including storage costs, exceeded $26,000.00.  Pls.' FAC at ¶ 42.

4

United States District Court
For the Northern District of California

1    On November 5, 2003 Plaintiffs filed the instant action

2  before this Court.  Plaintiffs listed four causes of action in

3  their complaint:  1) breach of contract; 2) violation of the

4  Consumers Legal Remedies Act, located in California Civil Code

5  § 1750, et seq.; 3) violation of California Business and

6  Professions Code § 17200; and 4) violation of federal law 49

7  U.S.C. § 14704.  Defendant then filed the present motion to

8  dismiss Plaintiffs' first three causes of action on the grounds

9  that these state law claims are preempted by federal law.

10  Defendant argues that these claims are preempted by the Carmack

11  Amendment and alternatively that they are subject to "field"

12  and/or "conflict" preemption due to the extensive amount of

13  federal legislation in this area.  Plaintiffs contend that

14  their state law claims are beyond the preemptive scope of the

15  Carmack Amendment and that there is room in this field for

16  state law to operate.  Having considered the parties' arguments

17  and the allegations in Plaintiffs' complaint, the Court grants

18  Defendant's Motion to Dismiss.  The Court's decision is

19  premised on the conclusion that federal regulations in this

20  area are so extensive as to make reasonable the inference that

21  Congress intended to occupy the entire field.

22

23  **III.  LEGAL STANDARD**

24       A.  Motion to Dismiss

25       "[A] complaint should not be dismissed for failure to

26  state a claim unless it appears beyond doubt that the plaintiff

27  can prove no set of facts in support of his claim which would

28                              5

entitle him to relief."  <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46

(1957).  "In reviewing a 12(b)(6) motion, this Court must

accept the factual allegations of the complaint as true and

must draw all reasonable inferences in favor of the plaintiff."

<u>Bernheim v. Litt</u>, 79 F.3d 318, 321 (2nd Cir. 1996).  Thus, the

Court's task "is merely to assess the legal feasibility of the

complaint, not to assay the weight of the evidence which might

be offered in support thereof." <u>Cooper v. Parsky</u>, 140 F.3d 433,

440 (2nd Cir. 1998).

　　　　B.  Federal Preemption

　　　　Federal law "shall be the supreme Law of the Land ... any

Thing in the Constitution or Laws of any State to the Contrary

notwithstanding," and state law in conflict with federal law is

"without effect.." <u>U.S. Const. art. VI, cl.2</u>; <u>Maryland v.</u>

<u>Louisiana</u>, 451 U.S. 725, 746 (1981).  Federal law can preempt

state law in three ways.[2]  One is by express statutory command.

<u>Morales v. Trans World Airlines, Inc.</u>, 504 U.S. 374, 382

(1992).  Second, state law is preempted "where the scheme of

federal regulation may be so pervasive as to make reasonable

the inference that Congress 'left no room' for the state to

supplement it." <u>Rice v. Santa Fe Elevator Corp.</u>, 331 U.S.

218,, 230 (1947).  Finally, state law is preempted where

"compliance with both federal and state regulations is a

---

　　　　[2]While these categories provide a helpful analytic
framework, they are not "rigidly distinct."  <u>Industrial Truck</u>
<u>Ass'n., Inc. v. Henry</u>, 125 F.3d 1305, 1309 (9th Cir. 1997)
(quoting <u>English v. General Elec. Co.</u>, 496 U.S. 72, 78-80
(1990).

physical impossibility" or state law "stands as an obstacle to the accomplishment and execution to the full purposes and objectives of Congress." Fla. Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43 (1963); Wis. Pub. Intervenor v. Mortier, 111 S. Ct. 2476, 2481 (1991).

Where Congress has not expressly preempted state law, courts look to the "goals and policies of the Act in determining whether it in fact preempts an action," with congressional purpose being the "ultimate touchstone." Int'l Paper Co. v. Ouellette, 479 U.S. 481, 493 (1987); Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516 (1992). A court's "ultimate task in any preemption case is to determine whether state regulation is consistent with the structure and purpose of the statute as a whole." Gade v. Nat'l Solid Wastes Mgmt. Ass'n., 505 U.S. 88, 98 (1992).

1. Field Preemption

Field preemption is implied when the scheme of federal regulation in a particular area is so pervasive as to leave no room for the States to supplement it. Bank of America v. City and County of San Francisco, 309 F.3d 551, 560 (9th Cir. 2002). "Federal regulations have no less pre-emptive effect than federal statutes." Id. (quoting Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 153 (1982)). Field preemption analysis normally begins with the presumption that Congress did not intend to supplant state law. However, the presumption is "not triggered when the State regulates in an area where there has been a history of significant federal presence." United

7

1    States v. Locke, 529 U.S. 89, 109 (2000).

2              2.  Preemption Under the Carmack Amendment

3        The Interstate Commerce Act contains several provisions

4    governing a motor carrier's liability to a shipper for the loss

5    of, or damage to, an interstate shipment of goods.  These

6    provisions, which are commonly referred to collectively as the

7    Carmack Amendment, have resided in different sections of Title

8    49 of the United States Code since their enactment in 1906.

9    The Carmack Amendment provides shippers with the statutory

10   right to recover for actual losses or injuries to their

11   property caused by carriers involved in the shipment.  At all

12   times relevant to this dispute, the pertinent part of the

13   statute provided as follows:

14              A common carrier ... subject to the
                jurisdiction of the Interstate Commerce
15              Commission ... shall issue a receipt or a
                bill of lading for property it receives for
16              transportation ....  That carrier ... and any
                other common carrier that delivers the
17              property and is providing transportation or
                service subject to the jurisdiction of the
18              Commission ... are liable to the person
                entitled to recover under the receipt or bill
19              of lading.  The liability imposed under this
                paragraph is for the actual loss or injury to
20              the property caused by (1) the receiving
                carrier, (2) the delivering carrier, or (3)
21              another carrier over whose line or route the
                property is transported in the United States.

22

23
     49 U.S.C. §14706(a).
24
          Prior to the enactment of the Carmack Amendment, the
25
     liability of carriers for loss of, or damage to, interstate
26
     shipments was determined by common law or the law of the
27

28                              8

1    states.   Adams Express Co. v. Croninger, 226 U.S. 491, 504

2    (1913).   In Adams Express the Supreme Court described the

3    problems that this framework created for interstate carriers:

4                [T]his branch of interstate commerce was
                 being subjected to such a diversity of
5                legislative and judicial holding that it was
                 practically impossible for a shipper engaged
6                in a business that extended beyond the
                 confines of his own state, or a carrier whose
7                lines were extensive, to know, without
                 considerable investigation and trouble, and
8                even then oftentimes with but little
                 certainty, what would be the carrier's
9                actually responsibility as to goods delivered
                 ... from one state to another.
10

11   226 U.S. at 505.   The Court went on to recognize the preemptive

12   scope of this legislation:

13               That the legislation supersedes all the
                 regulations and policies of a particular
14               state upon the same subject results from its
                 general character.   It embraces the subject
15               of the liability of the carrier under a bill
                 of lading which he must issue, and limits his
16               power to exempt himself by rule, regulation,
                 or contract.   Almost every detail of the
17               subject is covered so completely that there
                 can be no rational doubt but that Congress
18               intended to take possession of the subject,
                 and supersede all state regulation with
19               reference to it.

20   226 U.S. at 505-506.   Since Adams Express, courts have been

21   nearly uniform in holding that the Carmack Amendment preempts

22   state law remedies for loss or damage to goods shipped by common

23   carriers.   See e.g., Mallory v. Allied Van Lines, Inc., 2003 WL

24   22391296 (E.D.Pa.) (stating, "[T]he Carmack Amendment preempts a

25   state law cause of action if it involves loss of goods or damage

26   to goods caused by the interstate shipment of those goods by an

27   interstate carrier."); North American Van Lines, Inc. v.

28
                                         9

**United States District Court**
For the Northern District of California

1  <u>Pinkerton Sec. Systems, Inc.</u>, 89 F.3d 452 (1996) (finding, "The

2  Carmack Amendment thus preempts all state or common law remedies

3  available to a shipper against a carrier for loss or damage to

4  interstate shipments."); <u>Schultz v. Aud</u>, 848 F.Supp. 1497, 1502

5  (D.Idaho 1993) (stating, "Virtually every circuit to address

6  this issue has held that the Carmack Amendment preempts state

7  law remedies for loss or damage to goods shipped by common

8  carriers.").

9         Unfortunately, the Supreme Court case law does not provide

10  clear guidance on the reach of the preemption doctrine.  In

11  particular, the Court has not clarified the extent to which

12  state or common law causes of action that pertain to alleged

13  injuries that are altogether separate and distinct from any

14  claim of damage or loss of a shipper's belongings are preempted.

15  In the absence of such guidance federal courts have struggled to

16  reach a consensus.  The rule that has ostensibly emerged is that

17  the Carmack Amendment preempts claims based on loss or damage to

18  goods shipped in interstate commerce while claims based on

19  conduct separate and distinct from the delivery, loss of, or

20  damage to goods survive preemption.  See <u>e.g.</u>, <u>Rini v. United</u>

21  <u>Van Lines, Inc.</u>, 104 F.3d 502 (1st Cir. 1997) (holding that "all

22  state laws that impose liability on carriers *based on the loss*

23  *or damage of shipped goods* are preempted" but "liability arising

24  from separate harms -- apart from the loss or damage of goods --

25  is not preempted.") (italics in original); <u>Morris v. Covan World</u>

26  <u>Wide Moving, Inc.</u>, 144 F.3d 377, 382 (5th Cir. 1998) (holding

27  that the Carmack Amendment "preempts any common law remedy that

28                                    10

increases the carrier's liability beyond 'the actual loss or injury to the property' ... unless the shipper alleges injuries separate and apart from those resulting directly from the loss of shipper property."); <u>Gordon v. United Van Lines, Inc.</u>, 130 F.3d 282, 285-89 (7th Cir. 1997) (finding that the Carmack Amendment preempts common law claims for punitive or emotional distress damages unless the "shipper alleges liability on a ground that is separate and distinct from the loss of, or the damage to, the goods that were shipped in interstate commerce."); <u>Smith v. United Parcel Serv.</u>, 296 F.3d 1244, 1248-49 (11th Cir. 2002) (stating that "While we agree that situations may exist in which the Carmack Amendment does not preempt all state and common law claims, including ones for outrage, only claims based on conduct separate and distinct from the delivery, loss of, or damage to goods escape preemption.").

However, what constitutes a "separate and distinct" basis for liability is not at all clear.  Some courts have taken an expansive view regarding the scope of preemption under Carmack. In <u>United Van Lines, Inc. v. Shooster</u>, 860 F.Supp. 826 (S.D.Fla. 1992), the court confronted a fact pattern similar to that at issue in this action.  In <u>Shooster</u> the plaintiff was hired to ship the defendants' household goods from Pennsylvania to Florida.  When the goods arrived in Florida, the defendants were informed that the weight of their shipment was twice that of what had been estimated and thus the cost of their move was going to be considerably greater as well.  <u>Shooster</u>, 860 F.Supp.

**United States District Court**
For the Northern District of California

at 827.  The defendants refused to pay the full price and plaintiff initiated suit.  The defendants raised several affirmative defenses and counterclaims, including various fraud and a claim for assault and battery.  Id.  The plaintiff contended that all of defendants' counterclaims and affirmative defenses were preempted under the Carmack Amendment, and the court agreed.  With respect to the "bait and switch" claims, the court noted that the agreement between the parties contemplated that the actual weight would be more than the estimate and the agreement delineated the rights of the parties therein.  In finding that these claims were preempted the court stated that the Carmack Amendment "preempts virtually any state law claim." Id. at 828.  Moreover, the court held that the defendants' claim for assault and battery was preempted under Carmack.  Id. at 829.

In Smith, the Eleventh Circuit held that the plaintiff's state law claims were preempted under Carmack even though arguably none of the plaintiff's property had been damaged or lost.  Smith, 296 F.3d at 1249.  In Smith, the defendant refused to make regular deliveries to the plaintiff's home after a UPS driver had an altercation with the plaintiff and his son.  Id. at 1245.  The plaintiff alleged that rather than make regular deliveries to his home, UPS would leave a notice stating that an item could be picked up at the local UPS office.  The plaintiff brought suit alleging fraud, negligence, willfulness and outrage.  Id. at 1246.  The defendant filed a motion to dismiss on the grounds that the plaintiff's claims were preempted under

12

**United States District Court**
For the Northern District of California

1    Carmack.   Despite the plaintiff's argument that these claims

2    were "separate and distinct" from UPS's contract of carriage,

3    the court held they were preempted because they "clearly relate

4    to the delivery of goods."   <u>Id.</u> at 1247.

5        However, other courts have taken a more literal reading of

6    the statute's scope.   In <u>Mesta v. Allied Van Lines Int'l, Inc.</u>,

7    695 F.Supp. 63, 65 (D.Mass. 1988) the court held that state law

8    claims based on activities not undertaken in the course of

9    transporting goods are not subject to preemption under Carmack.

10   In <u>Gordon</u>, the Seventh Circuit held that the Carmack Amendment

11   did not preempt a claim for intentional infliction of emotional

12   distress.   In <u>Gordon</u>, a shipper sued an interstate common

13   carrier for failing to deliver the shipper's family memorabilia

14   and heirlooms, and for subsequently engaging in a four-month

15   course of deception in connection with that non-delivery.

16   <u>Gordon</u>, 130 F.3d at 283-84.   The plaintiff asserted several

17   grounds for relief, including fraud, breach of contract, and

18   willful and wanton conduct.   The court held that the Carmack

19   amendment preempted all of those claims because they essentially

20   arose out of the loss of or damage to plaintiff's goods.   <u>Id.</u> at

21   289.   However, the court held that the plaintiff's claim for

22   intentional infliction of emotional distress survived Carmack

23   Preemption because it was separate and independent from the loss

24   or damages to goods.   <u>Id.</u>

25       The precise scope of preemption under the Carmack Amendment

26   is uncertain.   Recognizing seemingly conflicting interpretations

27   on the preemptive scope of the Carmack Amendment, the Court will

28                                      13

1  apply the rule that Carmack preempts state law claims based on

2  loss or damage to goods while claims based on conduct separate

3  and distinct from the delivery, loss of, or damage to goods

4  survive preemption.

5

6  **IV.  <u>DISCUSSION</u>**

7       The Court views the question of whether Plaintiffs' state

8  law claims are preempted under the Carmack Amendment as an

9  entirely separate issue from whether they are subject to field

10 preemption, and accordingly will analyze them separately.  The

11 Carmack Amendment, located at 49 U.S.C. § 14706, pertains to

12 claims based on loss or damage to goods, and has spawned its own

13 doctrine of implied preemption.  The question of whether

14 Plaintiffs' claims are subject to field preemption analyzes the

15 entire federal statutory and regulatory framework relating to

16 the interstate transportation of household goods and attempts to

17 discern whether Congress intended to occupy the field in which

18 Plaintiffs' claims reside.  These separate questions will be

19 analyzed in successive sections below.

20      <u>A.  Plaintiffs' State Law Claims Are Not Preempted under</u>

21      <u>the Carmack Amendment Because They Relate to "Separate and</u>

22           <u>Independent" Harms</u>

23      This case involves a separate and independently actionable

24 harm to the shipper as distinct from the loss of, or damage to,

25 the goods shipped.  The harm that Plaintiffs allegedly suffered

26 was being subjected to Defendant's deceptive practice of

27 providing customers with a low estimate in order to obtain their

28                                    14

**United States District Court**
For the Northern District of California

business, and then informing them of the actual cost for their
move only after it was unlikely that they could retain the
services of another carrier.  Defendant's practice harmed
Plaintiffs in that they were forced to pay more for their move
than that to which they had originally agreed.  Nowhere do
Plaintiffs allege that their household goods were damaged or
even temporarily lost.  Furthermore, nowhere does the amount or
form of relief requested by Plaintiffs depend on the value that
is assigned to their belongings.  Quite simply, the conduct that
is at issue in this action is separate and distinct from any
damage to, or loss of, goods shipped in interstate commerce.
Thus, we hold that Plaintiffs' causes of action are not subject
to preemption under the Carmack Amendment.  The statute is clear
in stating that the "[L]iability imposed under this paragraph is
for the actual loss or injury to the property ...."  49 U.S.C.
§14706(a).  It seems relatively clear then that Plaintiffs'
allegations fall outside of this statute.

This conclusion is buttressed by examining the elements
that a plaintiff must establish in order to plead a successful
claim under the Carmack Amendment.  To establish a prima facie
against a common carrier under the Carmack Amendment, a
plaintiff must allege:  "(1) delivery of the goods to the
initial carrier in good condition, (2) damage of the goods
before delivery to their final destination, and (3) the amount
of damages."  <u>Beta Spawn, Inc. v. FFE Transp. Servs., Inc.</u>, 250
F.3d 218, 223 (3rd Cir. 2001); <u>see also</u>, <u>Newens v. Orna Servs.,
Inc.</u>, 2002 WL 1310734, at *2 (N.D.Cal.) (concluding that a

plaintiff must allege the <u>Beta Spawn</u> elements in order to survive a motion to dismiss).  Plaintiffs here could not make out a successful claim under the Carmack Amendment because they have not alleged any damage or loss to their goods.  It would thus seem a misapplication of this statute to conclude that it preempts Plaintiffs' state law claims.

B.  <u>Congress Has Manifested an Intent to Occupy The Entire Field of Interstate Transportation of Household Goods</u>   Defendant contends that the federal regulations governing the interstate transportation of household goods are so pervasive as to manifest Congress' intent to occupy this entire field.  Having reviewed the statutory and regulatory framework in this area, the Court agrees with this conclusion.

For many years, Congress and federal agencies have regulated pervasively every aspect of the arrangements made for interstate transportation of household goods, including the very matters raised by Plaintiffs' allegations.  <u>See</u> 49 C.F.R. pt. 375 (2002).  For example, carriers are subject to regulation of their estimates and the weighing of goods.  The regulations govern, among other things: carriers providing, prior to any contract, uniform written information to shippers regarding their rights and responsibilities when they ship household goods; providing non-binding estimates of weight and charges; providing written estimates; weighing the goods; shippers' ability to observe the weighing; and carriers' notifying customers of the actual charges for the shipment.  49 U.S.C. §§ 13704, 14104 (2000); 49 C.F.R. §§ 375.2, 375.3, 375.4, 375.5,

United States District Court
For the Northern District of California

375.6, 375.7, 375.9 (2002).  Also, Congress has defined weight-bumping and made it a federal crime.  49 U.S.C. § 14912 (2000).  Federal statutes require household goods carriers to publish tariffs containing their rates, rules and practices, and require that carriers collect the full amount due under the applicable tariff.  49 U.S.C. § 13702©), 13707.  There has been a federal 110% rule[3] for many years.  49 C.R.R. §§ 375.4(d); 375.407(a).  The term "transportation" has been defined rather broadly as including arranging for the transportation of property, receiving the property, storing the property, and delivering the property.  49 U.S.C. § 13102(21)(B) (2002).  These regulations, along with many others, comprise the comprehensive and pervasive federal regulation of the transportation of household goods.  In light of the breadth of the federal regulation in this area, it is reasonable to infer that Congress left no room for the States to supplement it. See Bank of America, 309 F.3d at 558 (citing Geier v. Am. Honda Motor Co., 529 U.S. 861, 884 (2000) (stating that in cases of field preemption, the "mere volume and complexity" of federal regulations demonstrate an implicit congressional intent to displace all state law.) In reaching this decision the Court is mindful that allowing Plaintiffs' claims to proceed would likely compromise the uniformity and certainty of the national scheme.  Allowing state law to operate here conceivably could create a new scheme of potential liability for a carrier, where the right to assert additional

---

[3]This rule provides that a carrier may not, under certain circumstances, charge more than 110% of their estimated price.

United States District Court
For the Northern District of California

17

United States District Court
For the Northern District of California

causes of action depended on the location to or from which the shipper moved.  This seems to be exactly what Congress was trying to avoid by entering this field.

The Court's decision is supported by the fact that the federal agency authorized to regulate household-goods transportation has stated expressly that its regulations occupy the field and preempt state law.  Congress has granted the Department of Transportation plenary authority to issue regulations governing the interstate transportation of household goods.  49 U.S.C. § 14104.  Pursuant to that authority, the Federal Motor Carrier Safety Administration ("FMCSA") currently administers consumer protection regulations covering all aspects of household goods transportation.  The FMCSA recently quoted the following comments by the American Moving and Storage Association ("AMSA") regarding the preemptive effect of this federal regulatory scheme:

> [I]t is appropriate at this point to address certain comments of NACAA [National Association of Consumer Agency Administrators].  NACAA urges that the proposed regulations should announce that they are supplementary law only and that violations will also subject movers to remedies provided by other Federal, State and local laws, such as State deceptive trade practices laws.  This suggestion reflects a fundamental misconception of the Supremacy Clause and Federal preemption.  There is not the slightest suggestion in the law or its precedent that Congress ever intended this explicit and comprehensive regulatory scheme to be supplemental to or superseded by any State law or regulation.  Congress could not have been clearer in expressing its intent to occupy the field of interstate household goods transportation regulation.  AMSA asserts the NACAA's contention is flatly

**United States District Court**
For the Northern District of California

1    wrong.

2    2003 Rulemaking, 68 Fed. Reg. at 35,089 (interim final rule).

3    After quoting this discussion, the FMCSA stated definitively,

4    "AMSA has correctly stated current case law on the preemption

5    issue."  Thus, according to the FMCSA, the field of interstate

6    transportation of household goods has been preempted by

7    Congress, and their view is entitled to some deference.  See

8    Industrial Truck Ass'n, 125 F.3d at 1311 (stating that "An

9    agency's interpretation of the preemptive effect of its

10   regulations is entitled to some deference where Congress has

11   delegated authority to the agency, the agency's interpretation

12   is not contrary to a statute, and agency expertise is important

13   to determining preemption."); Medtronic, Inc. v. Lohr, 518 U.S.

14   470, 496 (1996)

15   (stating that "Because the FDA is the federal agency to which

16   Congress has delegated its authority to implement the provisions

17   of the Act, the agency is uniquely qualified to determine

18   whether a particular form of state law 'stands as an obstacle to

19   the accomplishment and execution of the full purposes and

20   objectives of Congress', and, therefore, whether it should be

21   pre-empted.") (citations omitted).

22       Finally, preemption of Plaintiffs' state-law claims is

23   further underscored by the allegations in their complaint.

24   Plaintiffs do not contend that the same conduct on the part of

25   Defendant gives rise to federal and state claims.  Rather, their

26   state claims are expressly predicated on violations of federal

27

28                              19

law.  This, in addition to all of the other factors discussed above, convinces the Court that Plaintiffs must sue under Federal law.

**V.   CONCLUSION**

The federal regulatory scheme governing the interstate transportation of household goods is so pervasive as to make reasonable the inference that Congress left no room for state law to operate in this area.  Accordingly, Plaintiffs' first, second and third causes of action are HEREBY DISMISSED on the grounds that they are preempted by federal law.


**IT IS SO ORDERED.**

Dated: January 22, 2004


/s/ Samuel Conti
UNITED STATES DISTRICT JUDGE